IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


RICHARD CHAPMAN,

        Petitioner,

v.                                                                    CIV 98-161 BB/KBM

TIM LEMASTER, Warden,
New Mexico State Penitentiary, and
ATTORNEY GENERAL for the State
of New Mexico

        Respondents.


## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before the Court on Richard Chapman's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  *Doc. 1.*  For the reasons set forth below, I recommend that the petition be denied.

### I.  Procedural Background – AEDPA Applies

In every proceeding in the state courts and this Court, Chapman has been represented by counsel.  In 1979, he was sentenced to life imprisonment following a jury verdict finding him guilty of robbery and felony murder.  *Answer, Exh. A.*[1]  One of the issues he raised on direct appeal was that the trial judge failed to instruct the jury on an essential element of the crime of felony murder under *State v. Harrison,* 90 N.M. 439, 564 P.2d 1321 (1977).  *Exh. C* at 10.  In

---

[1]  Unless otherwise noted, all citations to exhibits are to those attached to Respondents' Answer, *Doc. 12.*

state post-conviction proceedings he raised ineffective assistance of counsel claims.  *Exhs. H -DD.*

His conviction was affirmed on direct appeal.  *Exh. F.*  His two post-conviction proceedings

based on ineffective assistance of counsel claims were likewise denied.  *Exhs. K, BB, CC, EE.*

In 1988 he brought his first federal petition for habeas corpus raising the ineffective

assistance of counsel claims and was permitted to amend to raise the instruction issue.  *Exhs. FF,*

*NN, SS.*  While matters were being briefed, the New Mexico Supreme Court decided *State v.*

*Ortega,* 112 N.M. 544, 817 P.2d 1196 (1991), and that decision was added as support to the

instructions on felony murder issue.  *Exh. WW.*  District Judge Juan G. Burciaga adopted the

recommendation of  Magistrate Judge Lorenzo F. Garcia, found the arguments without merit, and

dismissed the petition.  *Exhs. XX, ZZ.*  On appeal, the Tenth Circuit found that the *Ortega*

decision rendered the petition unexhausted and reversed with instructions to dismiss the petition

to allow petitioner to exhaust that argument in the state courts.  *Exh. DD.*

Thus, the district court  dismissed the case without prejudice on August 22, 1994, *Exh.*

*EEE,* prior to the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA").  The subsequent state court habeas proceedings were commenced on

February 23, 1995.  *Exh. FFF.*  The state district court summarily denied relief on the *Ortega*

issue, *Exh. LLL,* and although the New Mexico Supreme Court initially granted certiorari,

following briefing the writ was quashed on December 22, 1997, *Exhs. NNN-RRR*.

Chapman filed this second federal habeas petition on February 9, 1998.  Because he filed

this action after the April 24, 1996 effective date of AEDPA, its standards apply to this case.

*E.g., Paxton v. Ward,* 199 F.3d 1197, 1204 (10th Cir. 1999).  District Judge Bruce D. Black so

decided before the case was referred to me, *see Docs. 19, 22, 25,* and subsequent case law only

underscores that the decision was correct.[2]  Therefore, I find Petitioner's renewed assertion that I should apply pre-AEDPA standards without merit.

Under AEDPA, a federal court cannot grant a writ of habeas corpus unless the state court decision: (1) is "contrary to, or involved an unreasonable application of . . . Supreme Court" precedent; or (2) is "an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. §§ 2254(d)(1)-(2); *see also  Williams  v. Taylor,* 529 U.S. 632 , 120 S. Ct. 1495 (2000); *Van Woudenberg v. Gibson,* 211 F.3d 560, 566 & n. 4 (10th Cir. 2000), *petition for cert. filed 12/8/00.*  Because all of the issues can be resolved on the record, I find that an evidentiary hearing is unnecessary.  *E.g., Trice v. Ward,* 196 F.3d 1151, 1159 (10th Cir. 1999), *cert. denied,* 121 S. Ct. 93 (2000); Rule 8(a), *Rules Governing Habeas Corpus Under Section 2254.*

## II.  Factual Background

The parties' extensive briefs set out the factual background.  *Docs. 27, 33.*  There is no dispute how the victim, Terry Sanders, was killed.  During the course of a robbery, he was hit on the head with a pipe to incapacitate him, had his hands bound behind his back, and was shot in the

---

[2]  *Marsh v. Soares,* 223 F.3d 1217, 1220 (10th Cir. 2000) (for statute of limitation purposes, joining "all the circuit courts which have addressed this issue, and hold that a habeas petition filed after a previous petition has been dismissed without prejudice for failure to exhaust state remedies does not relate back to the earlier petition."), *petition for cert. filed 12/22/00; Barrientes v. Johnson,* 221 F.3d 741, 751 (5th Cir.) ("a federal habeas corpus petition filed after the effective date of AEDPA is governed by the Act where the petitioner's previous federal petition was filed before the effective date of AEDPA and was dismissed without prejudice for failure to exhaust state remedies"), *cert. dismissed,* ___ S. Ct. ___, 2000 WL 1889148 (12/4/00); *see also Pugh v. Gibson,* 2000 WL 1346397 (10th Cir. 9/1/00) (unreported) (holding that under reasoning in *Slack v. McDaniel,* 529 U.S. 473, 120 S. Ct. 1595 (2000), a "first petition . . . filed pre-AEDPA [and dismissed for failure to exhaust] is of no consequence.  Treating his second petition, filed post-AEDPA, as 'any other first petition,' the district court correctly applied AEDPA").

forehead with the bullet entering between his eyes and exiting the back of his skull. Chapman, Jim Humiston, Larry Smith, and Larry Smith's wife were arrested for this crime. Pat Smith pleaded guilty to a lesser offense, and Larry Smith and Humiston pleaded guilty to the murder. *See Exh. C. at 2.*

Chapman was charged with one count of premeditated murder or, in the alternative, felony murder, and charged with one count of armed robbery. After their arrests, both Chapman and Humiston made statements to the police. Chapman stated that "I did not kill Terry Sanders and, ah, I was with the people involved under the fear of my own life." Humiston said that "what happened should have been a robbery, but ended up being a murder because of those two assholes." Humiston testified as a hostile witness for the State at Chapman's trial, however, saying that Smith shot the victim and that his prior comment about the "two assholes" was not intended to refer to Chapman.

Specifically, Humiston testified that, with Chapman present, he and Smith discussed stealing the victims' money and van, and when Smith suggested killing the victim, he and Chapman rejected that idea. The testimony of Pat Smith corroborated this testimony that Chapman rejected the suggestion to kill the victim. Humiston testified on direct and redirect examination, that their plan included "some" degree of force or violence because the victim was a "big man." On cross and recross examination, he testified that the plan did not include any force or violence. Rather, the plan was to lure the victim away from his van, they would propose to poach a calf, have each person go in different directions, and have Chapman, Humiston and Smith circle back to the van while the victim was looking for a calf. They would then take the van and leave the victim stranded in the desert.

Humiston testified that when they left with the victim, he had a shotgun and a pipe, Smith had a pistol, but Chapman had no weapon.  When they stopped ostensibly to poach, Chapman left the van to take up his post as a "lookout."   Humiston and Smith remained in the van with the victim, and Humiston struck the victim on the head with the pipe to incapacitate him.  Humiston said Chapman had no idea that the pipe would be used, and when Chapman ran back to see what the commotion was, he was "unhappy" about Humiston's actions.  Humiston and Smith then tied the victim's hands and drove him farther from the road while Chapman resumed his position as lookout.  Humiston and Smith then dragged the victim from the van, and as Humiston started to walk back toward it, he heard the shot fired by Smith.

> Humiston exclaimed:  'You stupid son of a bitch!  What are you doing?'  Smith cocked the gun and pointed it at Humiston. Humiston turned around and walked to the van. . . .   Chapman was upset with this turn of events.

Independent witness testimony established that after the murder, Chapman drove the stolen van back to Smith's trailer.  The trio and Pat Smith then rushed to load the van with boxes and leave.   Another witness testified that while the trio was in Colorado, Chapman "did most of the talking" for the group . . . and that Chapman appeared to be the leader."   Another witness testified that Chapman carried a .357 caliber pistol in Colorado, which was consistent with the caliber of bullet fragments and wound the victim suffered.  This witness also testified that Chapman frequently drove the van in Colorado, "always wore gloves when he drove," and told him of his plans to "scrap the van."  Yet another witness testified that Chapman "took him to the spot where the van had been dismantled and concealed, and Chapman asked him if he could see anything."  *See Exh. BB* at 4-6; *Doc. 33* at 4-6, 37-38.

5

The jurors were instructed on premeditated murder, second degree murder, felony murder, armed robbery, robbery, and aiding and abetting.

### III.  Felony Murder Instruction Under *State v. Harrison*

#### A.  *State v. Harrison* **And Uniform Jury Instruction Amendment**

The controlling New Mexico Supreme Court decision on the elements of felony murder at the time of Chapman's 1979 trial was *Harrison.*  In *Harrison,* the New Mexico Supreme Court noted that first degree murder "requires malice aforethought or a greatly dangerous act without regard to human life," but that the state's felony murder statute "conclusively presumes that any homicide occurring during any felony is first-degree murder."  90 N.M. at 442, 564 P.2d at 1324. The Court decided that to

> conclusively presume that one who commits any felony has the requisite mens rea to commit first-degree murder is a legal fiction we no longer can support.  In felony murder cases where the felony is a first-degree felony such a presumption is appropriate, ***but not where the felony is of a lesser degree.***

*Id.* (emphasis added).

For lesser felonies, the Court discussed two different tests used to determine whether the mens rea attributable to "one who is committing a felony which is inherently or foreseeably dangerous to human life is sufficient to justify convicting a defendant of felony murder and sentencing him to death or life imprisonment."  *Id.*  The Court rejected an abstract test in favor of one that examines "both the nature of the felony and the circumstances surrounding its commission . . . to determine whether it was inherently dangerous to human life."  *Id.*  The *Harrison* court said that "this is a question for the jury to decide, subject to review by the appellate courts."  *Id.*  The court then summarized its holding saying that "in a felony murder

charge, involving a collateral lesser-degree felony, that felony must be inherently dangerous **or** committed under circumstances that are inherently dangerous." *Id.* (emphasis added).  The *Harrison* opinion noted that New Mexico Uniform Jury Instruction (hereinafter "UJI") "Crim. 2.04 . . . will have to be altered to conform herewith." *Id.*

Indeed, Uniform Jury Instruction 2.04 was amended before Chapman's trial, effective July 1, 1978.  As amended, it provided that to find a defendant guilty of felony murder the State must prove beyond a reasonable doubt that defendant committed or attempted to commit "the crime of _____ *[under circumstance or in a manner dangerous to human life]*." *See e.g., Exh. B* at 10 (emphasis added).  Note 4 to the new instruction said to use the bracketed phrase highlighted above "if the felony is not a first degree felony *and there is an issue* as to whether the felony or attempt was committed under circumstances or in a manner dangerous to human life." *Id.* Committee Commentary to the newly-amended jury instruction read *Harrison* to mean that the first question is whether the underlying felony is inherently dangerous, a "question of law to be determined by the court."  If not, then whether the underlying felony was carried out in a dangerous fashion would be submitted to the jury.  *Exh. D at 3.*

### B. Jury Instructions Did Not Completely Omit Issue Of Dangerousness

Chapman argues that under *Harrison* an element of felony murder to be found by the jury is "dangerousness" of the underlying felony.  He argues that due process was violated because the felony murder jury instruction in his case did not use the amended uniform jury instruction and **completely** omitted the element of dangerousness.  *See Rael v. Sullivan,* 918 F.2d 874, 875 (10th Cir. 1990), *cert. denied,* 499 U.S. 928 (1991).  Indeed, the jurors at Chapman's trial were not specifically instructed that they were to find "dangerousness" in the instruction covering felony

7

murder.   Instead, they were instructed that to convict Chapman of felony murder, they must

unanimously agree that the State had proven the following elements beyond a reasonable doubt:

1.  The defendant committed or attempted to commit the crime of robbery or armed robbery;

2.  During the commission of or the attempt to commit robbery or armed robbery, the defendant caused the death of Terry Lynn Sanders;

3.  This happened in New Mexico on or about the 24th day of April, 1978.

*Exh. C* at 11.  It is not clear from the record whether the trial court omitted the bracketed

language because it thought the underlying felony in Chapman's case was inherently dangerous.

However, the robbery instruction contained the charge that to find Chapman guilty of

robbery they had to find that he intended to "permanently deprive" the victim of the van and that

he "took the van by threatened force or violence."  *Exh. D* at 1 (emphasis original).  They were

further instructed that to find Chapman guilty of aiding and abetting, they had to find that:

1.  During the commission of or the attempt to commit the robbery or armed robbery, someone caused the death of Terry Lynn Sanders;

2.  The defendant helped, encouraged or caused the robbery or armed robbery to be committed or the attempt to commit the robbery or armed robbery;

3.  The defendant intended that the robbery or armed robbery be committed;

4.  This happened in New Mexico on or about the 24th day of April, 1978.

*Doc. 27 at 14.*  During polling, one juror "wanted to make it clear that none of the jurors had

agreed that Chapman directly caused Sanders' death.  Rather, they all agreed that he was guilty of

aiding and abetting as defined in the court's instruction."  *Id.*

8

While "a complete failure to instruct on an essential element of an offense violates the right to due process," *Rael,* 918 F.2d at 875, the critical factor in analyzing a federal due process claim on habeas review is whether there in fact was a complete failure, *Esquibel v. Rice,* 13 F.3d 1430, 1433 (10th Cir.), *cert. denied,* 513 U.S. 951 (1994).  On direct appeal, Chapman challenged the lack of dangerousness element in the felony murder instruction.  The state argued that because the robbery instruction included the "threat of violence" charge, the *Harrison* "dangerous" element was satisfied.  The New Mexico Supreme Court agreed with the State in its December 27, 1979 opinion affirming the conviction where it held:

> The element of inherent danger required by *Harrison* was included in the instruction given concerning robbery, the underlying felony. The instruction given on this charge required the jury to find that defendant had 'threatneed (sic) force or violence' before he could be convicted of robbery in any degree.  This instruction on the underlying felony satisfies the 'inherently dangerous' element of felony murder jury instructions.  Each instruction need not contain within its limits all the elements to be considered, so long as the instructions as a whole do contain them.  *State v. McFerran,* 80 N.M. 622, 59 P.2d 148 (Ct. App. 1969), *cert. denied,* 80 N.M. 731, 460 P.2d 26 (1969).

*Exh. F.* at 1.

Although Chapman's "complete omission" argument on direct appeal was raised as a state law claim, the New Mexico Supreme Court employed the same analysis as this Court must in analyzing his due process claim.  That is, "a single instruction may not be judged in artificial isolation but must be viewed in the context of the overall charge."  *Esquibel,* 13 F.3d at 1433 (and Supreme Court cases cited therein).

The New Mexico Supreme Court's decision that the "threat of violence" instruction satisfied the *Harrison* dangerousness element is a interpretation of state law that cannot be the

9

basis for habeas relief even if I were convinced the decision was wrong. *E.g., Rael,* 918 F.3d 877; *see also Engle v. Isaac,* 456 U.S. 107, 121 n. 21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process."). The New Mexico Supreme Court found no error because the element of dangerousness was not completely omitted from the instructions. Thus, this does not present a situation as in *Rael* where there was a "complete failure" to instruct. Like the Tenth Circuit in *Esquibel,* the fact that the "threat of violence" charge in a separate instruction covered the element of dangerousness, takes this case out of the "complete failure to instruct" arena.

Magistrate Judge Garcia arrived at the same conclusion[3] in Chapman's first federal habeas action, finding that the

> jury instructions given, taken as a whole, fairly and correctly presented the issues and applicable law. The jury's conclusion that defendant committed each element of the underlying felony, including the element of threatened force or violence, satisfied the *State v. Harrison* requirement.

*Exh. XX* at ¶19. I agree with Judge Garcia's analysis.

### C.  Any Error In The Instructions Was Harmless

Even if the instructions could be considered "ambiguous" or erroneous as a matter of state law, the issue is whether there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the constitution." *Esquibel,* 13 F.3d at 1433-43 (internal quotations and citations omitted). In this regard, Chapman argues that the jurors could have

---

[3]  The State argues that the conclusions reached by this Court in the first habeas petition should apply as the "law of the case."  Because that first proceeding concluded without a final decision by the Tenth Circuit, I do not find the conclusions binding, but do consider them persuasive.

found that he intended to use "some force" to take the victim's van and money, but that he did not intend deadly force would be used.  He asserts that because he was personally acquitted of armed robbery, the jury in fact found that he did not know a gun would be used.  The State argues that the evidence is undisputed that the robbery was in fact committed in a dangerous manner, and that Chapman participated in the robbery as an aider and abettor as found by the jury.

In the first habeas case, Judge Garcia found that the

> uncontradicted evidence presented to the jury confirms that the underlying felony was committed under circumstances or in a manner dangerous to human life.  There was no dispute that Petitioner, Jim Humiston and Larry Smith drove Terry Sanders to the desert.  Jim Humiston struck Sanders on the head with a pipe and, thereafter, tied Sanders' hands behind his back.  It was undisputed that Larry Smith shot Sanders in the head, killing him.  It is beyond dispute that Terry Sanders was robbed and that the **means and manner of the robbery were accomplished by acts dangerous to his life,** and indeed, were fatal.

*Ex. XX* at ¶ 20 (emphasis added).  I concur with this finding.

The only intent necessary to satisfy accomplice liability under New Mexico law at the time of Chapman's conviction was that Chapman intended the robbery be committed.[4]  While the jury

---

[4] *State v. Dominguez,* 115 N.M. 445, 455, 853 P.2d 147, 157 (Ct. App.) (although Dominguez was required to have shared the principal's intent . . . he did not have to intend or foresee the end result (in this case, the stabbing);" finding that defendant displayed his approval before, during, and after the fight), *cert. denied,* 115 N.M. 409, 852 P.2d 682 (1993); *State v. Luna*, 92 N.M. 680, 683, 594 P.2d 340, 343 (Ct. App. 1979) (presence plus community of purpose is sufficient to sustain conviction as aider and abettor, such as presence in car where occupants discuss robbery and agreed to do so); UJI 14-1620, 14-1621 (intent required for robbery and armed robbery is same -- intent to permanently deprive the victim of property); *see also State v. Salazar,* 78 N.M. 329, 331, 431 P.2d 62, 64 (1967) (occupant of car who was shot and "incapable of performing any act or forming requisite criminal intent" not sufficient where codefendants stole tires from store as afterthought upon leaving scene where defendant had been shot); *State v. Ortega,* 112 N.M. 554, 569, 817 P.2d 1196, 1211 (1991) (noting that law in effect prior to this decision required only that defendant intend the underlying felony).

found that Chapman did not personally carry a gun and did not pull the trigger killing the victim, they did find that he intended to rob the victim with the threat of violence.  There is ample evidence to support that conclusion.  It is undisputed that Chapman agreed to rob the victim. There is no dispute that Chapman knew either Humiston or Smith was initially inclined to kill the victim in order to rob him.  The jurors were told the victim was a "big man" and it is a matter of common sense that a victim may resist efforts to take his property.  There is no evidence that the weapons Humiston and Smith were carrying were concealed from Chapman when they set out on their endeavor.  Indeed, their ruse of poach calves would allow them to carry the weapons without arousing the victim's suspicion, and the presence of the weapons would provide a convenient threat if the victim resisted.  Even if Chapman did not intend for the victim to be physically harmed, he agreed to rob the victim and set out with two men who were armed with weapons to accomplish that goal.  Having observed that his codefendant had bludgeoned the victim with a pipe, he nonetheless returned to his role as lookout aware that violence was already a part of the robbery.

There is no dispute that the crime was carried out in a dangerous manner.  The fact that Chapman helped get the victim into the van and out to the desert by participating in the charade of poaching calves alone is sufficient to find him guilty as an accomplice for felony murder under *Harrison.  See State v. Varela,* 128 N.M. 454, 461, 993 P.2d 1280, ___ (1999) (Varela and two others were cruising and drinking, they picked up a shotgun, Varela suggested a "job" but testimony that Varela did not shoot the gun and conflicting testimony whether he was driving the car; court held evidence sufficient to impose felony murder liability as an accomplice);  *State v. Mora,* 124 N.M. 346, 354, 950 P.2d 789, ___ (1997) (defendant argued his acquittal of criminal

sexual penetration of a minor meant his conviction for criminal sexual contact was not inherently

dangerous; jury received a "danger" instruction on contact count; court found evidence sufficient

to support that finding).

### D. *Harrison* Issue Summary

In rejecting the felony murder instruction claim, the state court did not employ a standard

that is "contrary" to Supreme Court precedent and did not reach a result that is an "unreasonable"

application of Supreme Court precedent.  Furthermore, as the issue of the sufficiency of the

instructions on the element of dangerousness was a matter of state law, I conclude that there was

no error cognizable in habeas corpus.  Even if there were, I have no doubt that any error in the

jury instructions had no "substantial and injurious effect or influence in determining the jury's

verdict."  *E.g., O'Neal v. McAninch,* 513 U.S. 432, 437 (1995); *Hale v. Gibson*, 227 F.3d 1298,

1324 (10th Cir. 2000).

### IV.  The Federal Constitution Does Not Require Retroactive Application of *Ortega*

Chapman also argues that due process was violated because the jurors were not instructed

to find that he had an intent to kill as required by *State v. Ortega,* 112 N.M. 554, 817 P.2d 1196

(1991), a decision issued a decade after his conviction became final.  *Ortega* changed New

Mexico's felony murder rules, and adopted the unique position that in addition to the underlying

felony, proof of intent to kill is required to convict for felony murder.

> We follow the lead of the United States Supreme Court in
> construing our statute on felony murder – a statute which at most is
> silent on the necessity of an intent-to-kill element, and certainly
> does not expressly negate any such requirement – as requiring
> proof that the defendant intended to kill (or had the state of mine
> otherwise generally associated with mens rea).

112 N.M. at 526, 817 P.2d at 1204.  Chapman maintains that *Ortega* should be applied

retroactively and is not *Teague*-barred.  However, the State persuasively argues the contrary

position.

## A.  *Ortega* Announced A New Rule

Chapman raised the issue of applying *Ortega* retroactively in his first habeas action.  *Exh.*

*WW.*  There, as here, Chapman argues that *Ortega* did not announce a new rule in New Mexico

felony murder law, but I disagree.

The New Mexico Supreme Court specifically noted in that opinion that the Uniform Jury

Instruction governing felony murder at that point only required proof that defendant intended that

the underlying felony be committed.  The *Ortega* court further stated that as "we have held in this

opinion, this point is *no longer* correct as matter of New Mexico law, so UJI 14-2821 will have to

be amended accordingly." 112 N.M. at 569, P.2d at 1211 (emphasis added).  Moreover, the

Tenth Circuit's remand to require exhaustion of the *Ortega* issue in Chapman's first federal

habeas case specifically noted that the "*Ortega* issue presents a new and unresolved question of

state law."  *Exh. DDD.*  Also, other New Mexico decisions (including the dissenting judge in

*Ortega*) note that the *Ortega* ruling was issued in the midst of debate on the subject and

constituted a new and unique rule compared to other states.  Finally, the *Ortega* decision did not

overrule the *Harrison* holding – *Harrison* continues to be applied post-*Ortega* along with the

additional *Ortega* requirement.[5]

---

[5]  *E.g., State v. McGruder,* 123 N.M. 302, 306, 940 P.2d 150, ___ (1997) ("New Mexico
has a distinct version of the felony-murder doctrine. . . .  The primary distinction between New
Mexico's felony-murder doctrine and those of other jurisdictions is that, in [*Ortega*], this Court
imposed a mens rea requirement for felony murder.") (internal quotations and citations omitted);
*State v. Livernois,* 123 N.M. 128, 132, 950 P.2d 1057, ___ (1997) ("Notwithstanding the on-

I find that the result in *Ortega* was not dictated by *Harrison* and was susceptible to much debate.  Instead, *Ortega* "broke new ground," imposing a new obligation on prosecutors in New Mexico.  *E.g., Butler v. McKellar,* 494 U.S. 407, 412-415 (1990); *compare State v. Duffy,* 126 N.M. 132, 141, 967 P.2d 807, 816 (1998) (prior decision concerning whether legislature intended lesser included offense "was recognized in cases *that we issued prior to the crime in question* [and therefore the prior decision] did not set forth a new legal standard; rather it clarified an existing principle of law.") (emphasis added).  *Ortega,* therefore, announced a new rule.

### B.  Retroactivity Is An Issue Of State Law Not Cognizable In Federal Habeas

Chapman's first federal habeas suit was dismissed to permit exhaustion of the his *Ortega* claim,  *Exh. EEE,* and in the state courts he raised the issue of retroactive application.  *Exh. FFF.* The *Ortega* decision does not specifically hold that its new rule is to be applied retroactively. Simply because *Ortega* applied the new standard in the case before it on direct appeal does not resolve the issue of whether New Mexico will require *Ortega* to be applied it retroactively to cases that became final before it was decided.  The longstanding general rule is that new criminal rules *do* apply to cases on direct review, *e.g., Teague v. Lane,* 489 U.S. 288, 303-04 (1989), and

---

going debate surrounding the rightness of the felony murder doctrine, . . . or whether due process requires proof of intent for felony-murder conviction[s], . . .  New Mexico now requires that for a felony-murder conviction, the jury must find 'an intent to kill in the form of knowledge that the defendant's acts create a strong probability of death or great bodily harm' to the victim or another. . . .  Indeed, our jury instruction was recently amended to require a finding of intent") (internal quotations and citations omitted); *Mora,* 124 N.M. at 353-54, 950 P.2d at ___ ("In *Harrison,* this Court considered two approaches in determining whether a felony is inherently dangerous for felony murder purposes . . . [and] adopted the factual approach. . . .  We see no reason to deviate from that ruling today."); *Ortega,* 112 N.M. at 561 n.4, 817 P.2d at 1203 n.4 ("Nothing in the present opinion is intended to prevent the fact finder from using the circumstances of the underlying felony – particularly where the felony is 'inherently dangerous,' as *Harrison* requires in many cases – as a basis for an inference that the killer possessed the requisite intent to kill").

that is the rule followed by the New Mexico Supreme Court, *Duffy,* 126 N.M. at 141, 967 P.2d at 816 ("we have indicated that a new ruling by this Court is applicable to all cases that are pending on direct appeal.").

However, I have found no New Mexico decision discussing *Ortega* retroactivity on collateral review, save for the decision by the state district court after dismissal to exhaust, which Chapman urges has no precedential value. The state district court concluded, without discussion, that *Ortega* "should not be applied retroactively to Petitioner's case and conviction." *Exh. LLL* at 2. The New Mexico Supreme Court granted certiorari on the issue, but following briefing quashed the writ. *See Exhs. NNN - RRR.*

Having no decision from the New Mexico Supreme Court, Chapman urges that this Court must decide the issue as a matter of state law in the first instance or should certify the question to the New Mexico Supreme Court. Were this Court to decide the issue for the New Mexico courts as a matter of state law, I would conclude that *Ortega* would not apply retroactively on collateral review because it does not implicate double jeopardy.[6] But I believe it would be inappropriate for

---

[6] *State v. Nunez,* 129 N.M. 63, ___, 2 P.3d 264, 293 (1999) ("Obviously, once the new rule is enforceable [i.e., when the court's opinion is filed], it will apply to all subsequently filed cases. Conversely, it seems apparent that a change of law by an appellate court will have no retroactive application to any case that is finalized before the date the court's decision is filed" and mentions an exception can be where the new rule "applies to the protection against double jeopardy"); *see also Santillanes v. State,* 115 N.M. 215, 224, 849 P.2d 358, ___ (1993) (refusing to apply change negligence standard for child abuse to case before it on direct appeal under *Linkletter v. Walker,* 381 U.S. 618 (1965) analysis because, among other things, application would not deter conduct that already occurred); *see also Jackson,* 143 F.3d at 1324 (New Mexico Supreme Court held its decision in *Contreras* [conviction for both armed robbery and felony murder violates double jeopardy] did not apply retroactively to Jackson's conviction, which became final before *Contreras* was decided). While the Supreme Court has abandoned the *Linkletter* approach to retroactivity of criminal decisions pending on direct review, New Mexico has not. *State v. Mascarenas,* 129 N.M. 230, ___, 4 P.3d 1221, 1228 n.5 (2000).

16

this Court to so decide in a habeas suit, because state law cannot form the basis of federal habeas

relief.  At least one other court has so indicated in a case virtually identical to this case.  *See*

*Martin v. Warden, Huntingdon State Correctional Institution,* 653 F.2d 799 (3ʳᵈ Cir. 1981), *cert.*

*denied,* 454 U.S. 1151 (1982).  The Third Circuit later explained:

> Consistent with the Supreme Court's admonition that federal
> courts not require retroactive application of state judicial decisions,
> this court has refused to require application of new state decisions
> in habeas proceedings.  In *Martin*, the petitioner claimed that the
> trial court's jury instructions misstated the requirements of the
> Pennsylvania felony-murder rule.  *Id.* at 810.  Although the
> Supreme Court of Pennsylvania rejected Martin's argument on
> direct appeal, it subsequently interpreted the felony-murder rule in a
> manner that cast doubt on the charge given in Martin's case.  *Id.* at
> 810-11.  We rejected Martin's argument for retroactive application
> of the new decision, stating:
>
>> Even were [the new decision] to be given retroactive
>> effect . . . it would not be the responsibility of a
>> federal court to apply this newly formed state
>> decisional law to a state conviction obtained almost
>> a decade ago.  Martin's remedy on such a claim is
>> not in this court.  Therefore, under the then-existing
>> Pennsylvania law of felony murder, the judge
>> adequately charged the jury . . . .

*Fiore v. White,* 149 F.3d 221, 225 (3ʳᵈ Cir. 1998), *rev'd,* 121 S. Ct. 712 (2001) (per curiam).[7]

---

[7]  Although the Third Circuit's decision in *Fiore* was ultimately reversed, the United
States Supreme Court decision it is not controlling here.  In *Fiore,* defendant and his codefendant
were convicted of operating a hazardous waste facility without a permit, not because they had no
permit, but because they deviated from the permit's terms.  Fiore's conviction became final after
the Pennsylvania Supreme Court declined to review his case.  Later, it reviewed his codefendant's
case and reversed that conviction, holding that the statute only condemned operating without a
permit, not someone with a permit who deviates from its terms.  Fiore was unsuccessful in having
his conviction likewise set aside on state collateral review.  He then sought federal habeas relief,
which was denied by the Third Circuit as not cognizable in federal habeas.

The Supreme Court of the United States granted certiorari "in part to decide when, or
whether, the Federal Due Process Clause requires a State to apply a new interpretation of a state
criminal statute retroactively to cases on collateral review."  It then asked the state court whether

Because this matter involves retroactivity of state law, the federal decisions cited by Chapman concerning construction of federal statutes and retroactivity are inapposite.  In federal habeas proceedings, the question whether a state does or does not apply one of its decisions retroactively does not present a cognizable constitutional claim.[8]  The only narrow exception appears to be where a state court interprets a statute for the first time, issuing a ruling that is not "new" but instead "furnishes the proper statement of law at the date [petitioner's] conviction became final."  *Fiore v. White,* 121 S. Ct. 712 (2001) (per curiam).  *Ortega* neither construed New Mexico's felony murder statute for the first time, nor was it a pronouncement of the law in effect when Chapman's conviction became final.  Thus, for the reasons discussed in footnote 7, the Supreme Court's decision in *Fiore* establishing an "exception" to the non-retroactivity rule

its decision was "a new interpretation" or whether it was "a correct statement of the law when Fiore's conviction became final."  The state answered that its decision was not new and merely clarified the law as properly stated  at the time of Fiore's conviction.  Based on this response, the Supreme Court thus found that the "case presents no issue of retroactivity."  Rather, the issue was whether due process permits conviction for conduct that the statute does not prohibit, and the "inevitable conclusion" was that it does not.  Thus, the Supreme Court's reversal in *Fiore* did not otherwise overrule its previous decisions that there is no constitutional obligation for state to apply new criminal decisions retroactively and that retroactivity does not present a cognizable federal habeas claim.

[8]  *Jackson v. Shanks,* 143 F.3d 1313, 1324 (10th Cir.) ("Whether we construe Mr. Jackson's argument as a direct challenge to the new Mexico Supreme Court's retroactivity analysis [holding that *Contreras* applies prospectively only] or as a federal constitutional claim, Mr. Jackson's claim fails.  The Constitution does not impose any requirement that state judicial decision be applied retroactively . . . and the issue whether a state court decision applies retroactively is a state law issue . . . upon which we may not issue a writ of habeas corpus."), *cert. denied,* 525 U.S. 950 (1998); *see also Robinson, v. Ponte,* 933 F.2d 101, 103-04 (1st Cir. 1991) ("notwithstanding the fact that a state court's announcement of a new rule was based on that court's conclusion that the new rule was impelled by federal constitutional principles, the state court's decision whether to make this new rule retroactive raises no federal constitutional issue."), *cert. denied,* 503 U.S. 922 (1992); *Morris v. McKune,* 812 F. Supp. 1150 (D. Kan.) (denied relief on holding that it "should not engage in intrusive action merely because it may disagree with a state court's interpretation of state law."), *appeal dismissed,* 1 F.3d 1249 (10th Cir. 1993).

does not control here.  Accordingly, certification of the question would serve no useful purpose.

### C. *Teague* Bars This Court's Retroactive Application Of *Ortega*

If this Court were to find as a matter of federal *constitutional* law that New Mexico is

bound to apply *Ortega* retroactively, it would be announcing a new rule in a collateral proceeding,

and *Teague* would bar the new ruling from being applied to give Chapman relief. *Teague* prohibits

new constitutional rulings[9] from being applied in collateral proceedings unless the ruling falls

within one of two exceptions.  Both exceptions are narrow and "must be consistent with the

recognition that

> [a]pplication of constitutional rules not in existence at the time a
> conviction became final seriously undermines the principle of
> finality which is essential to the operation of our criminal justice
> system. . . .  The costs imposed upon the State[s] by retroactive
> application of new rules of constitutional law on habeas corpus thus
> generally far outweigh the benefits of this application.

*Sawyer v. Smith,* 497 U.S. 227, 242 (1990) (citations and internal quotations omitted).  Neither

exception applies here.

To fall within the first exception, the ruling must place "certain kinds of primary, private

individual conduct beyond the power of the criminal law-making authority to proscribe."  *Butler*,

494 U.S. at 415-16.  To fall within the second exception, the rule "must not only improve

---

[9]  Chapman argues that *Teague* is inapplicable because *Ortega* is a "substantive" as opposed to "procedural" decision.  However, the United States Supreme Court and the Tenth Circuit characterize instructions issues as "trial error."  *Neder v. United States,* 527 U.S. 1, 119 S. Ct. 1827, 1833-34 (1999) (omission of element from jury instruction not structural error and subject to harmless error analysis); *California v. Roy,* 519 U.S. 2, 117 S. Ct. 337, 339 (1996) (per curiam) (claim of erroneous instructions because of failure to instruct on intent to aid in commission of crime found to be "trial error," not "structural error"); *Espinosa v. Williams,* 132 F.3d 42, 1997 WL 767766 (10th Cir. 1997) (applying harmless error standard in *Brecht* to a claim that *Ortega* entitled petitioner to relief because *Ortega* claim under *Roy* is characterized as "trial error").

accuracy, but also alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding."  *Id.*  As *Teague* noted, it is "unlikely that many such components of basic due process have yet to emerge."  *Id; see also Tillman v. Cook,* 215 F.3d 1116, 1121-1122 (10th Cir.), *cert. denied,* 121 S.Ct. 664 (2000).  A finding that the federal constitution requires *Ortega* to be applied retroactively to cases that became final before it was decided will neither decriminalize felony murder nor will it improve accuracy or affect the basic procedures attendant a fair trial.

### D.  Even If *Ortega* Applies Retroactively, It Would Not Afford Relief

Assuming for the purposes of argument that *Ortega* applies retroactively, liability for accessories is imposed where defendant knew he was "helping to create a strong probability of death or great bodily harm" to the victim.  UJI 14-2822(6); *see also Livernois,* 123 N.M. at 132. For the same reasons discussed above, any lack of instruction of this sort was harmless because of the circumstances surrounding the crime.  The evidence was sufficient for a rational jury to have found the requisite intent under this standard.[10]

### V.  Ineffective Assistance of Counsel Claims Are Without Merit

Chapman raises two claims of ineffective assistance of counsel.  The two-prong test announced in *Strickland v. Washington,* 466 U.S. 668 (1984) governs ineffective assistance of counsel claims.  *E.g., Mayes v. Gibson,* 210 F.3d 1284, 1288 (10th Cir.), *cert. denied,* 121 S.Ct.

---

[10]  *See Varela*, 454 N.M. at 461, 993 P.2d at ___; *see also Kersey v. Lytle,* 215 F.3d 1337, 2000 WL 331873 (10th Cir. 2000) (unpublished) ("Kersey claims that the evidence did not show beyond a reasonable doubt that he knew Clark intended to kill Farley or knew that his participation in Clark's plan might result in death or great bodily harm.  Again, we disagree."); *Espinosa, supra* ("We need not decide whether *Ortega* applies retroactively because, even assuming it does and that the instructions were thus flawed, our independent review of the record leads us to conclude that such assumed error does not mandate habeas relief here.").

586 (2000).  Movant must first show that counsel's representation was "objectively

unreasonable."  *Clayton v. Gibson,* 199 F.3d 1162, 1177 (10th Cir. 1999), *cert. denied,* 121 S.Ct.

100 (2000).  In doing so, he must overcome the "strong presumption" that counsel's conduct falls

within the "wide range" of conduct that is considered to be trial strategy and is deemed

"reasonable professional assistance."   To be constitutionally ineffective, counsel's conduct "must

have been completely unreasonable, not merely wrong."  *Moore v. Gibson,* 195 F.3d 1152, 1178

(10th Cir. 1999), *cert. denied,* 120 S. Ct. 2206 (2000); *see also Hawkins v. Hannigan,* 185 F.3d

1146, 1152 (10th Cir. 1999).

Petitioner must also establish "prejudice" – absent counsel's errors, there is a "reasonable

probability" that the outcome of the trial would have been different.  *Moore,* 195 F.3d at 1178.

"Reasonable probability" means that confidence in the outcome is undermined.  *Foster v. Ward,*

182 F.3d 1177, 1185 (10th Cir. 1999), *cert. denied,*  529 U.S. 1027 (2000).  An ineffective

assistance of counsel claim fails if either of the *Strickland* prongs are not met.  It is entirely

appropriate for a habeas court to analyze the prejudice prong first and exclusively, if that is the

easier course.  *E.g., Scoggin v. Kaiser,* 186 F.3d 1203, 1207 (10th Cir.), *cert. denied,* 528 U.S.

953 (1999); *Cooks v. Ward,* 165 F.3d 1283, 1292-93 (10th Cir. 1998), *cert. denied,* 528 U.S. 834

(1999).

On federal habeas review, state factual findings are presumed correct.  Chapman must set

forth "clear and convincing evidence" to defeat that presumption.  Thus, I review these claims in

light of the factual findings made by the state court.  *See* 28 U.S.C. § 2254(e)(1); *see also e.g.,*

*Valdez v. Ward,* 219 F.3d 1222, 1231 (10th Cir. 2000).

## A.  Mr. Moeller

Douglas[11] Moeller represented Chapman pretrial.  Chapman argues that Moeller was ineffective because, without reviewing any of the evidence in the case or adequately advising Chapman of the doctrines of felony murder and duress, Moeller allowed Chapman to make the statement to the police that he was with the people who killed Sanders and was in fear for his own life.  He attributes the alleged deficiencies to Moeller's inexperience because at the time he counseled Chapman – Moeller had just received his license to practice and had neither tried a case nor participated in a felony case beyond the preliminary hearing stage.

The statement in question was made on September 26, 1978.  The pleadings filed by Chapman on direct appeal outline the sequence of events leading up to this statement.  A complaint charging Chapman with Sanders' murder was filed sometime before his June 12, 1978 arrest on an unrelated charge (apparently federal bank robbery charges).  The next day he was arrested on the murder charge and interrogated and officers took his statement.[12]  On June 14, 1978, officers obtained a warrant and searched Chapman's home.   On June 20, 1978, while being questioned by FBI agents, he was offered immunity on the federal charges and was told that if he cooperated the agent would "do what he could" on the murder charge.  However, Chapman denied any involvement in the murder.

On June 23, 1978, officers again searched the area around Chapman's house and discovered the victim's van partially dismantled.  In July 1978, Pat Smith was arrested.  On the

---

[11]  Apparently this attorney's name is "F.D. Moeller," *see Exh. P* at ¶5, and he is alternatively referred to as "F.D.," "Fred," or "Douglas" in the pleadings, *see e.g., Exh. B* at 5.

[12]  The date of June 13, 197<u>9</u> is an obvious typographical error.  *Exh. B at 2.*

basis of her testimony, the state secured an indictment against Chapman on the murder charge on

September 25, 1978. That same day he was arraigned and Mr. Moeller was appointed to

represent him. The next day, September 26, 1978, Chapman was transported to the penitentiary.

*See Exh. B* at 1-5; *Exh. C* at 2-5.

  Following an evidentiary hearing, the state court found as a matter of fact that Chapman

initiated the request to make a statement when he was being transported to the penitentiary.

Accordingly, the officers took him to Moeller's office where he "conferred with both Moeller and

Tom Cornish, Jr., an associate of Moeller who was a more experienced attorney." Chapman told

them of his participation in planning the robbery. Because the attorneys had not yet received

discovery, they "did not know the strength of the State's case or the State's theory of

prosecution, and therefore relied upon Chapman's version of the facts." *Exh. BB at 2.* The state

court further found that

> with both attorneys aware of the elements of the felony murder
> rule, ***both attorneys advised Chapman not to make any statement
> whatsoever.***
>  ***Despite the attorneys' advice, Chapman insisted upon
> making a statemen**t to the sheriff's deputies, district attorney
> investigators, and assistant district attorneys present.
>  ***Because of Chapman's insistence, Moeller aided in the
> drafting to the following statement, given by Chapman after
> being advised of his constitutional rights but against Moeller's
> advice: "I did not kill Terry Lynn Sanders and ah — I was with
> the people involved under fear for my own life."***
>  In giving the statement, Chapman failed to follow the advice of
> his appointed counsel.

*Id.* (paragraph numbers omitted) (emphasis added).

  The facts found by the state court establish that the statement was not made because of

any inexperience on the part of Mr. Moeller, lack of investigation, or failure to appraise Chapman

of felony murder and duress law.  To the contrary, Chapman's two attorneys were presented with the impending statement before they had time to investigate, and they advised him to make no statement at all.  When he insisted upon doing so, Mr. Moeller attempted to minimize the effect of Chapman's choice by helping him prepare a minimal statement.  The attorneys did not permit the officers to question Chapman further.

Chapman sets forth no evidence, much less clear and convincing evidence, to defeat the presumption that the emphasized state court factual findings above are correct.  Judge Garcia relied on these findings in concluding that

> [c]ontrary to petitioner's assertions, his attorney advised him not to make the statement and he elected to do so otherwise.  Counsel's advice [to make no statement whatsoever] was sound.  An attorney is not ineffective when his client elects to disregard sound advice and then complains of the consequences of his own decision.

*Exh. XX* at 8-9.  I concur with Judge Garcia's conclusion that counsel's conduct was not deficient.  *See Stano v. Dugger,* 921 F.2d 1125, 1152 (11th Cir.) ("Proceeding against counsel's advice is not proceeding without counsel's advice"), *cert. denied,* 502 U.S. 835 (1991).  Failure to establish the deficiency prong alone is sufficient to deny habeas relief on this claim.  Moreover, because he insisted on making the statement against counsel's advice, Chapman cannot establish prejudice as a matter of law.  *Cf. Wallace v. Ward,* 191 F.3d 1235, 1248 (10th Cir. 1999) ("[P]etitioner has not shown prejudice. He has not shown that but for any failure of counsel to investigate he would not have pleaded guilty or sought the death penalty. . . .  Rather, the record shows petitioner was *absolutely determined* to plead guilty and to obtain the death penalty.") (emphasis added), *cert. denied,* 120 S.Ct. 2222 (2000).  Therefore, it is unnecessary to address Chapman's claims of prejudice in this regard.

## B.  Mr. Donatelli

Chapman argues that his trial counsel, Mark Donatelli, was ineffective because he failed to record Humiston's pretrial statement and later use it to impeach his testimony.  With respect to this claim, Judge Garcia stated:

> Petitioner's complaints against attorney Mark Donatelli are meritless.  Petitioner claims that his attorney should have tape recorded his conversations with Jim Humiston because of the potential that the witness would subsequently change his story. In an affidavit, Mr. Donatelli stated:
>
>> . . .  I evaluated James Humiston as a potential defense witness.  I met with Mr. Humiston to determine what he knew about how Terry Sanders died.  . . . Mr. Humiston, at all times, told me that Mr. Chapman was not involved in the murder, and I considered him a friendly witness. . . .  When called to testify as a state's witness, Mr. Humiston told a story significantly different that he repeatedly told me before trial.  His in-court testimony implicated my client . . . in  a felony murder. . . .
>
>> Considering Mr. Humiston's favorable remark, it was not unreasonable for Mr. Donatelli not to record his conversations. There was no indication that his testimony would change. Moreover, as a matter of tactics or strategy, defense counsel often choose not to record or memorialize a witness' statement out of concern that the written statement will have to be produced and a friendly witness' prior statement may be used for impeachment if there is any variance in the witness' subsequent testimony.  The decision not to record a witness's statements is one of trial tactics and strategy.

*Exh. XX* at 9.

I concur with this reasoning and add that I also find no prejudice.  Chapman argues he was prejudiced because at trial Humiston said he agreed to a "strong-arm robbery" and served as a lookout.  However, based on the discussion above, there was ample evidence to find him guilty as

an accomplice to felony murder based on his intent to rob the victim with threatened violence and

his participation in the ruse that allowed the crime to be committed.

     Wherefore,

     **IT IS HEREBY RECOMMENDED THAT** the petition be denied.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1).  **A party must file any objections with the Clerk of the District Court within the ten day period  if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

 

_____

UNITED STATES MAGISTRATE JUDGE